DEMPSEY v. O'ROURKE et al.

(Supreme Court, Special Term for Trials, Kings County. December 17, 1915.)

SPECIFIC PERFORMANCE ☞88—GOOD FAITH.

 Plaintiff, who procured a contract to sell realty by fraud from an old woman under physical disability, and who was guilty of inequitable conduct throughout the transaction, could not have specific performance after the agreed vendor's death against her heirs at law, although the administrator, by collusion with plaintiff, made no contest, since he who comes into equity must come with clean hands.

 [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 226; Dec. Dig. ☞88.]

Suit by Lillian T. Dempsey for specific performance against Michael F. O'Rourke, as administrator of Sarah Ridgway O'Rourke, deceased, and others, heirs at law of decedent. Complaint dismissed.

Stallo Vinton, of New York City (John J. O'Connell, of New York City, of counsel), for plaintiff.

William W. Wingate, of Brooklyn, for defendant administrator.

Hirsh & Newman, of Brooklyn (Benjamin Reass, of Brooklyn, of counsel), for defendants heirs at law.

KELLY, J. "He who comes into equity must come with clean hands." It is impossible to consider the transactions of the plaintiff, her friend and witness, Carpenter, and her more recent ally, the defendant O'Rourke, with the dead woman, Sarah R. O'Rourke, without recurring often to this ancient and homely maxim of equity jurisprudence. Professor Pomeroy discussed the principle, many years ago, and his reason for the rule, stated with his accustomed clarity and force, might well be written into the decision of this case:

"It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him all recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." Pomeroy's Equity Jurisprudence, § 397.

And the learned author proceeds in section 400:

"I shall now give some examples to illustrate the circumstances under which this principle operates in the administration of equitable relief, and the manner in which it is applied. The first instance which I shall mention is found in the familiar doctrine which controls the equitable remedy of the specific performance of contracts. A contract may be perfectly valid and binding at law; it may be of a class which brings it within the equitable jurisdiction, because the legal remedy is inadequate; but if the plaintiff's conduct in obtaining it, or in acting under it, has been unconscientious, inequitable, or characterized by bad faith a court of equity will refuse him the remedy of a specific performance and will leave him to his legal remedy by action for damages. * * * The doctrine here applied means that the party asking the aid of the court must stand in conscientious relations towards his adversary; that the transaction from which his claim arises must be fair and just. * * * By virtue of this principle, a specific performance will always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of his position, or by any other means which are unconscientious; and when the contract itself is unfair, one-sided, unconscionable, or affected by any other such inequitable feature, * * * specific performance is refused simply because the plaintiff does not come into court with clean hands."

I think the plaintiff and the defendant administrator on their own showing place themselves under the ban described so clearly by the learned commentator, because it is idle to endeavor to separate the plaintiff and the defendant administrator. They have openly allied themselves in this litigation; the plaintiff insisting upon the specific performance of an alleged contract of the deceased Mrs. O'Rourke, by which plaintiff agreed to pay $50,000 for certain real estate in Brooklyn, although the heirs of the dead woman offered to convey the

property to plaintiff for $44,000. But Mrs. Dempsey, although she agreed at one time to purchase from the heirs and to discontinue this action, in view of the charges of fraud made against her by the dead woman in her lifetime, and pocketed $500 of the heirs' cash, suddenly changed her mind, and now disinterestedly insists that the original contract be carried out, and that she be allowed to pay $6,000 more for the property, because the husband of the deceased, Mrs. O'Rourke, insists that the first contract was genuine and worked an equitable conversion of the real estate into cash, which must go into his pocket as administrator, and not to the heirs of the dead woman.

It is true that he was separated from his aged wife, a woman of some 75 years of age and many years his senior. It is true that she had commenced a suit for separation from him, the complaint in which cannot be found, although it is not claimed that the suit was discontinued before the death of this aged woman. It is true that she was on record in her sworn answer to plaintiff's demand for specific performance, made in her lifetime, asserting that this contract was a fraud perpetrated on her. The plaintiff and the administrator of the woman who charged her with fraud have joined forces, and the learned counsel who, as attorney for the dead woman, vigorously and characteristically denounced this contract as an "outrageous swindle" has seen a new light in the doctrine of equitable conversion.

On Tuesday, August 19, 1913, Mrs. Sarah O'Rourke was a woman over 75 years of age. She was blind in one eye, but, although the other eye was somewhat impaired, she could see. It is not charged that she was of unsound mind. She lived a solitary and what must have been an unhappy life. Formerly the wife and then the widow of "Gen. Burbridge, of Kentucky," separated from her second and more youthful husband, whom she had married in her declining years, she lived practically alone in the two dwellings, Nos. 108-110 Montague street, Brooklyn. The houses were badly in need of repair. There was a caretaker in the house, one woman, who hired a room in the premises, and perhaps a companion or friend, a Mrs. Winegar, now deceased. It does not appear, however, that this Mrs. Winegar lived with Mrs. O'Rourke. Out of all our teeming population, but one witness was called, who pretended to any social relations with her —a Mrs. McKinney. This lady was called as a witness for the plaintiff, protesting that she was an unwilling witness, about which, however, I am not sure.

On the same morning, Tuesday, August 19, 1913, Mrs. O'Rourke had never seen Mrs. Dempsey, and Mrs. Dempsey had never seen or heard of Mrs. O'Rourke. On August 21st, before noon, Mrs. Dempsey had a contract by which the old lady agreed to convey to her the two houses mentioned for $50,000, title to be closed in 10 days, by which Mrs. O'Rourke was not to receive one cent of cash consideration, but was to convey her property free and clear of incumbrances, simply on Mrs. Dempsey's promise that she would pay it in 5 years, secured by bond and a mortgage on her own property. Mrs. O'Rourke's insurance policies had been turned over to Mrs. Dempsey. She agreed to turn over her furniture to Mrs. Dempsey, receiving in payment a chattel mortgage, and Mrs. Dempsey, two or three days

later, moved into Mrs. O'Rourke's house with her children and para-phernalia.

Mrs. Dempsey was a lady of no financial responsibility whatever. She was the mistress of a boarding house on Montague Terrace, but it was some other woman's boarding house. The former manager had broken down in health, and Mrs. Dempsey went in to run it for her during the summer, and the rent was $50 per month, which is not exorbitant for a house on Montague Terrace, if things were work-ing well. Mrs. Dempsey intended to take a lease of the premises. She was going to rent accommodations to a music school, and had other plans for improving her condition, when she was so suddenly transfigured into a real estate owner on the heights with $50,000 of property in her name. Apparently her lines had not been prosperous ones. According to her own story she had a rooming house on Sixth avenue, but gave it up, and had later had some interest in property on Nostrand avenue, which she had lost. She was not the sort of purchaser to whom $50,000 worth of improved city real estate on Montague street would ordinarily be turned over by an entire stranger, for no consideration save a bond secured by a mortgage on the identi-cal property conveyed. "A vendor about to sell his property," says the Court of Appeals, "and to a very large amount, naturally looks carefully to his pay. A merchant or manufacturer who should sell his wares to a corporation having no other capital than the exact property bought, and take his pay in the stock of such corporation, would scarcely be deemed sane in business circles." People v. N. R. S. Co., 121 N. Y. at page 614, 24 N. E. at page 836, 9 L. R. A. 33, 18 Am. St. Rep. 843.

And no interest was to be paid on the mortgage for the first year. At 4½ per cent. this would mean $2,250. But payment of the inter-est was secured by the conveyance to her by Mrs. Dempsey of cer-tain lots or land at "New Riverhead," in Suffolk county, a place which ought to be within this judicial district, but which is not on the map, or list of post offices. But if Mrs. Dempsey owned land at "New Riverhead," it presumably represented something, although there are many acres of land near the older settlement of that name which are not generally considered very valuable as real estate holdings. There is no evidence as to what Mrs. Dempsey's title was, or whether she had any title, and there was no suggestion made of any intention on Mrs. O'Rourke's part to have the title searched. Mrs. Dempsey claim-ed, however, that she owned the land, and for the purposes of this action I assume she did own it. There is certainly no competent proof that it had any value. Her friend and adviser, Mr. Carpenter, essayed a guess that as "acreage" property it was worth $200 an acre, but he never saw it and did not know where it was.

How this unusual, if not startling, situation was brought about, we must take from the lips of Mrs. Dempsey, the plaintiff, her witness, Mr. Edward Carpenter, a friend of Mrs. Dempsey, some 65 years of age, dealing "somewhat in real estate, principally in stocks and bonds," for 50 years, and Mrs. McKinney, the social acquaintance called as a witness by the plaintiff. Mrs. O'Rourke is in her grave. She died in January, 1914. In her lifetime there was no mistake about her atti-

tude.    At the risk of arrest the old lady took the contract back by
force from Carpenter, and to Mrs. Dempsey's demand for specific
performance she protested under oath that she had been defrauded.
Mrs. Winegar, the companion of Mrs. O'Rourke in her successful at-
tack on Mr. Carpenter, is also dead and gone.

Mrs. Dempsey had some friend, unknown, who thought Mrs.
O'Rourke's house was to let for boarding house purposes.    She asked
Mrs. Dempsey to stop in and make inquiry.    Mrs. Dempsey called on
August 19th, but Mrs. O'Rourke was out.    That day Mrs. O'Rourke
called on Mrs. Dempsey at the Montague Terrace house, and the ladies
met for the first time.    Mrs. O'Rourke insisted that Mrs. Dempsey
buy her houses for $50,000.    She wanted to get the property off her
hands.    It did not pay.    "She had been down in the summer in Dela-
ware; that her husband was down there building bungalows, and she
wanted to be there with him."    Strangely enough, she appears to have
said nothing about the separation suit pending between herself and
her husband, and in a day or two she was introduced to Mrs. Demp-
sey's friend, Mr. Carpenter, and was asking him how she could get
a divorce, as a separation was not quite what she wanted.    Mrs.
Dempsey did not have the $50,000 to pay for the house, but Mrs.
O'Rourke said no money was necessary.    On August 20th, Mrs. Demp-
sey went to the Montague street property, entering it apparently for
the first time.    What her inmost thoughts at the situation were we
do not know.    Mrs. O'Rourke's lawyer was in the mountains, and she
did not like lawyers anyhow, because they were expensive.    Mrs.
Dempsey thought of her friend, Carpenter, the experienced real estate
man and operator in stocks and bonds, and Mrs. O'Rourke, although
of course she had never seen or heard of him before, agreed with
Mrs. Dempsey that he would be a good man to put the deal through.

Mrs. Dempsey telephoned Mr. Carpenter, and he called on her at
Montague Terrace that afternoon.    Together they went up to Mrs.
O'Rourke's property, and the experienced Mr. Carpenter looked it
over, and undoubtedly looked over the old lady as well.    He thought
she was rather garrulous, telling all about her affairs to a "stranger";
but he insists that she knew what she was doing.    He ascertained that
the property had rented for $3,600 per year, and multiplying this by
10, and noting that the houses were out of repair, he said they were
not worth more than $36,000.    Now, one would think from all this
that Mr. Carpenter was representing Mrs. Dempsey; but this is a
mistake according to Mr. Carpenter, because, confronted with the fact
that this lonely old woman, "garrulous" and "talkative," as he de-
scribes her, signed away her property within 24 hours without any one
to advise her, he says that he was acting for her (Mrs. O'Rourke), not
for Mrs. Dempsey.    At some time in the 24 hours between his visit
to Mrs. O'Rourke with his friend, the plaintiff, and the next morning,
when he drew the contract in the privacy of his office, in longhand,
no duplicate, and put it in his safe, he ceased to represent Mrs. Demp-
sey and represented Mrs. O'Rourke.    She told him she did not want
any lawyer.    Apparently she trusted him.    She asked his advice about
getting a full divorce from her husband, because a separation under

the New York law was not enough; and he advised her, and he called in his son, a lawyer, to advise her, that she could sign the deed of the property without her husband joining with her under the New York law. And she went away with Mrs. Dempsey that Thursday afternoon, promising to bring him the deeds the following Tuesday. He kept the contract in his safe.

On Tuesday the old lady brought in the title deeds, and before she left the office Mr. Carpenter had drawn up a deed of the property to Mrs. Dempsey, the old lady had signed it and acknowledged it, and this was also left with Mr. Carpenter and locked in his safe. On Wednesday or Thursday the old lady, over 75 years of age, came back with her friend and companion, Mrs. Winegar. She asked to see the papers, and Mr. Carpenter got them out of the safe and gave them to her and her friend to look at. Strange to say, while his back was turned the old lady and her friend ran away with the papers. She took them surreptitiously from the man who was acting as her adviser, not as Mrs. Dempsey's friend. If she was of sound mind and "shrewd," as Mr. Carpenter makes her out to be, one would think that she thought she had been defrauded—or possibly Prof. Pomeroy's word "overreached" is a more pleasant way of putting it—and that she also knew her trusted adviser would not give up her papers if she asked for them. But Mr. Carpenter pursued them out into the hall, caught them, and brought them back to his office by force. He called up the superintendent of the building, and insisted that the papers be given back to him. He threatened to arrest them. Mrs. Winegar protested that she should be allowed to go, and she was permitted to leave, and then it turned out that she (Mrs. Winegar) had the papers, and not the 75 year old Mrs. O'Rourke. Mr. Carpenter satisfied himself that his new-found client did not have her own contract and her own deed in her possession. She opened her satchel and "satisfied" him that she did not have the papers. He says he did not search her, but the probabilities are against him. And in that way this old woman repossessed herself of the deed and the contract.

Surely this is a most interesting transaction from the outset for the consideration of a court of equity, which searches the conscience of litigants and brushes away the veils and concealments with which it is sought to hide the truth, in order to get at the real facts, and to see that its decrees are not issued to help on wrongdoers and confirm what ought to be set aside. This was the situation when this suit for specific performance was commenced in the fall of 1913. Mrs. O'Rourke answered the complaint, denying the contract and its validity, alleging that she had been defrauded and deceived by the plaintiff and Mr. Carpenter, that at the time she signed the alleged contract she was incapacitated, because she was blind in one eye and could not read with the other without glasses, and that she had none with her. She alleged that she had been informed that the contract provided for the payment of $5,000 in cash, that she had no personal knowledge of what it contained, and that immediately on the discovery of the fraud perpetrated on her she repudiated the alleged contract, and she asked this court to decree that the contract be canceled and the com-

plaint dismissed. This verified answer was presented by Messrs. Bond & Babson, her attorneys. The verification is dated October 14, 1913. The case was reached for trial in December, 1913. It went over the term, and in January the old lady left this world and all her trials and difficulties.

It may be well here to refer briefly to some of the subsequent transactions of the plaintiff and the defendant administrator, who are before the court in this action, the one asking for specific performance, and the other asking that it be decreed that the contract thus denounced and repudiated by his former wife be confirmed, and that it be decreed that an equitable conversion occurred, and that the $50,000 mortgage be turned over to him. Mrs. O'Rourke left no will, no father, mother, or descendant, and Mr. O'Rourke inherited her personalty and was appointed administrator of her estate. It appears that after the death of Mrs. O'Rourke the plaintiff, who so far as appears by the evidence had never met the husband up to that time, entered into negotiations with Mrs. O'Rourke's heirs at law, or they entered into negotiations with her, to get rid of the lawsuit, so that the property might be sold and the proceeds divided in some way between the nephews and nieces. And Mrs. Dempsey did sign a paper, in evidence, by which she agreed to discontinue this action and to assign all her claim under the agreement now in suit to a nephew of the dead woman, representing the heirs at law. She signed a letter containing the following statement:

"As a further consideration of the agreement of sale and of settlement of the action of Dempsey against O'Rourke, and in view of the answer interposed in said action by the defendant, I hereby waive all or any rights that I might have for the enforcement of the claim set forth in the complaint I filed therein, and I hereby consent to any decision by the court that said agreement as set forth in said complaint is invalid and void, and I further agree to assist in any way not involving any expense to me any defense that may be interposed by the heirs of Mrs. O'Rourke to any action brought by her husband to enforce said agreement. I do this in view of the allegations set forth in the answer of Mrs. O'Rourke concerning the circumstances surrounding the execution of the contract."

But when the attempt to discontinue was made, then Mr. O'Rourke, giving up the building of bungalows in Delaware, appears on the scene, protests that it cannot be done without his consent, and, pleading "equitable conversion," brings about another kaleidoscopic change on the scene more startling than Mr. Carpenter's transformation in the preceding August from plaintiff's friend and broker to the adviser of the old lady. The deed which had been regained from Carpenter by his dead wife at such personal risk was in his possession as administrator. Carpenter, who, notwithstanding his client's repudiation of the agreement, had assumed to go ahead with the exchange, had a mortgage and a deed of the elusive "New Riverhead" real estate in his possession. The heirs were trying to dispossess O'Rourke, who was asserting rights in the property as tenant. All this was in May, 1914. These suitors in equity then engaged in this transaction:

O'Rourke delivered the deed recovered by his wife to the plaintiff. Carpenter gave up the bond and mortgage of the New Riverhead real

estate to Mr. O'Rourke. All parties appeared in the Municipal Court in the dispossess proceedings. The plaintiff was there with the deed in her possession. Mr. O'Rourke agreed:

"I am willing to enter into an agreement that the deed will not be recorded until next Wednesday."

How O'Rourke could make such an agreement on behalf of plaintiff, or why plaintiff assented to it, is not clear; but before Wednesday the defendant heirs had an injunction bringing the performance to a halt. But this is hardly correct, for Mrs. Dempsey, to whom the deed was delivered and who had it in her possession, has in some way divested herself of the title; the mortgage and the deed of the "New Riverhead property" are back with her, or with Carpenter. I do not know whom he is representing now. The learned counsel for the deceased old lady, who had denounced the contract as an "outrageous swindle," appears as counsel for O'Rourke, and also appears to have manipulated this battledore and shuttlecock performance with muniments of title, and all the parties are now before this court in this action, asking for equitable adjustment of their rights.

I do not find any great difficulty in deciding the issues presented. I think the learned counsel for the administrator was right when, as counsel for the deceased old lady, he called the transaction an "outrageous swindle." But I will adopt Prof. Pomeroy's possibly less obnoxious characterization of the alleged contract. I say the agreement was obtained "by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of his [plaintiff's and her agent, Mr. Carpenter's] position, and by other means which are unconscientious; that the contract itself is unfair, one-sided, unconscionable, and affected by other such inequitable features." In such case "specific performance is refused because the plaintiff does not come into court with clean hands."

I find that the old lady was misled; that her age and incapacity were taken advantage of; that she acted without advice of counsel, and that the plaintiff and Carpenter accomplished this result deliberately; that the minds of the parties never met; that the dead woman, misled and hoodwinked as she was, believed and intended that she should at least receive a payment of $5,000 in cash; that it was part of the oral promises made by plaintiff and Carpenter on the eve of agreement that Mrs. Dempsey should expend money in repairs, improvements, and alterations of the property; and that this was intentionally omitted from the contract when it was prepared by Mr. Carpenter. On the whole case, I find that plaintiff is not entitled to this real estate—not only because she has voluntarily relinquished all claims to it for cash, and on her tacit admission that the dead woman had been deceived, but because the whole transaction is saturated with unjust and unfair dealings with the dead woman and her heirs at law.

The plaintiff does not come into court with clean hands, and her complaint should be dismissed upon the merits, with costs.